IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BEASLEY SINGLETON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:11-cv-713-WHA |
| | ) | (WO) |
| AUBURN UNIVERSITY | ) | |
| MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

This case is before the court on a Motion for Summary Judgment filed by Defendant, Auburn University Montgomery ("AUM"), on July 6, 2012 (Doc. # 26), and a Motion to Strike Affidavits and Other Evidence (Doc. #34) filed by AUM on August 22, 2012.

The Plaintiff, Beasley Singleton ("Singleton"), filed a Complaint, along with three other individuals, on June 24, 2011.  Pursuant to the court's September 2, 2011 Memorandum Opinion and Order, severing the original case into four separate cases, Singleton filed an Amended Complaint on September 14, 2011.  The court ruled on two AUM Motions to Dismiss the Amended Complaint, resulting in only two of Singleton's claims proceeding to the summary judgment stage.  The court also struck a reference to age discrimination and to tenure in Count II of the Amended Complaint.  (Doc. #11 at p.10).  The remaining claims are a claim of a racially hostile working environment in violation of Title VII (Count I),  and race and gender discrimination in termination in violation of Title VII and § 1981 (Count II).

The court has federal question subject matter jurisdiction over these claims. *See* 28 U.S.C. § 1331.

For the reasons to be discussed, the Defendants' Motion to Strike is due to be GRANTED in part and DENIED in part and the Motion for Summary Judgment is due to be GRANTED.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

## III.  FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

The Plaintiff, Singleton, was formerly employed at AUM. He began working at AUM in 1991 as a maintenance technician in the Housing and Residential Life Department.  His last position at AUM was Supervisor in the Housing and Residence Life Department.

In 2010, AUM informed Singleton and other employees that their last day of employment would be September 30, 2010.  AUM has provided evidence that in order to take advantage of potential cost savings, AUM decided to outsource trade service positions within the Facilities Department and the Housing and Residence Life Department.  Wanda Meadows, Vice Chancellor of Financial Affairs, has stated in a declaration that she was involved in the outsourcing of trade positions and that Sodexo was the successful bidder on the outsourced trade service positions.  Twelve positions were designated for elimination including Electrician, Coordinator, Carpenter, Senior HVAC Technician, HVAC Technician, Mechanic, two

3

Maintenance Technicians, Painter, Plumber, Supervisor, and Maintenance Service Manager. Six of these positions were held by white employees and six positions were held by African-American employees. AUM states that it requested of the outsourcing company, Sodexo, that all affected employees be granted a job interview. AUM provides evidence that all of the duties of the outsourced trade service positions were assumed by Sodexo employees as of October 1, 2010. AUM's position is that Singleton was not hired by Sodexo, but could have applied for an available position at AUM while in layoff status until October 6, 2010, when Singleton submitted his resignation and cut off his layoff status.

Singleton states that he was subjected to racially-offensive comments during his employment with AUM. Singleton himself identifies in his deposition the term "Do Boy" as being used on one occasion by Dale Caldwell, an AUM Human Resources employee, several years before his deposition. A former AUM employee, Brenda Foster, attributes the term "Do Boy" and "Boy" to Daryl Morris, Singleton's supervisor at the time of his termination.[1] Singleton has also stated that other unnamed people told him that Wanda Blake,[2] Vice Chancellor for Financial Affairs, said that an African-American employee, Dorsey Smith, did not deserve to make $95,000 because he was black. (Singleton Dep. at p. 19:7-14). Singleton further testified in his deposition that when his then-supervisor Glenn Allen ("Allen") told Kevin Shout ("Shout"), a former AUM Director, that Singleton was one of the best they will ever have, Shout said that they had to find a way to keep Singleton from being the best they had. The day he

---

[1] This evidence is subject to the pending Motion to Strike filed by AUM.

[2] AUM has submitted the Declaration of Wanda C. Meadows, Vice Chancellor of Financial Affairs. The two women named Wanda who hold the title Vice Chancellor of Financial Affairs are apparently the same person.

retired in 2004,[3]  Allen told Singleton that Singleton had to watch his back because of his color. (*Id.* at p.44:22-45-1).  Singleton also states that Morris said "as soon as I take over, I am going to take care of Beasley's ass."  (*Id.* at p. 48: 5-8).  Singleton points to his removal from a meeting of supervisors even though he performed without pay the duties of white persons who were allowed to remain at the meeting.   Singleton has also identified other instances of racial disparate treatment which he says were suffered by other African-American employees of AUM. Singleton also cites to the EEOC charges of others at AUM.  Finally, Singleton points to testimony in his deposition that he suffered frustration and passed out on one occasion because of mental anguish caused to him by AUM, although he appears to tie this mental anguish primarily to the loss of his job.  *(Id.* at p.157:3-158:1).

## IV.  DISCUSSION

### A.  Racial Harassment Claim

AUM contends that Singleton cannot establish a racial harassment claim because none of the comments or conduct he has described relate to race, that much of his evidence is inadmissible, and that even if the comments which are admissible were race-based, they did not rise to the level of racial harassment.   Before the court can evaluate the racial harassment claim, therefore, the court must first address AUM's Motion to Strike, and then determine what admissible evidence is of race-based comments or conduct, so as to be relevant to a racial harassment claim.

---

[3] AUM provides the affidavit of Jeanine Boddie-LaVan in which she states that Allen retired from AUM on July 31, 2004.

1.  Evidentiary Issues

a.  Motion to Strike

AUM has moved to strike in their entirety, or in part, the affidavits of Debra Foster, Louvenia McCray, Adrianne Giles, and Beasley Singleton.  AUM also moves to strike the EEOC charges of various persons and the Complaints filed by other persons against AUM.

AUM moves to strike affidavits in whole or in part because they contain opinions which the affiants are not qualified to state, they contain inadmissable hearsay, and assertions not based on personal knowledge.

Inadmissible hearsay cannot be considered on a motion for summary judgment.  *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999).  If hearsay can be "reduced to admissible form" at trial, however, it may be considered. *Macuba*, 193 F.3d at 1324.  In addition, Singleton "may also support a claim of hostile work environment by the use of harassing conduct he learned of through hearsay" so long as he was aware of the incidents during his employment. *Melton v. Nat'l Dairy LLC,* 705 F. Supp. 2d 1303, 1341 (M.D. Ala. 2010).

In his affidavit, Singleton has identified certain conduct as being conduct of which he was made aware during his employment, specifically:  actions described by Foster as taken by Katherine Jackson against African-American women and occurring before 2009,[4] a white employee calling employee Carrie Martin ("Martin") a "nigger," Adrianne Giles being forced to use a time clock while white employees were not, and Morris treating Judith Hagan more favorably than Louvenia McCray ("McCray") and Martin.  Therefore, these events, identified as

_____

[4] In her affidavit, Foster describes disparate treatment of herself and a Dr. Cyprian in paragraphs 5 through 13, and states that she left employment with AUM in 2009.  (Doc. #32-3).

being known to Singleton during his employment, will be considered for purposes of the harassment claim.

Another statement objected to as hearsay, however, has not been identified by Singleton as being a statement of which he was aware and, therefore, will not be considered for purposes of the harassment claim; namely, a statement by Adrianne Giles that she received correspondence stating "we do not like blacks here."   In addition, while Singleton states that he was aware of actions against African-American women by Katherine Jackson as described in Foster's affidavit, Singleton does not refer in his affidavit to the statements in Foster's affidavit of alleged disparate treatment by unnamed AUM officials, such as those included in paragraphs 9, 12, 14, 15 and 19-26 of her Affidavit, objected to by AUM on various grounds.  There being no evidence to demonstrate that those actions were known to Singleton during his employment, so as to contribute to a hostile environment as experienced by him, the court will not consider that evidence for purpose of the racial harassment claim.  *See, e.g., Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995)(stating "some of the incidents relied upon were not made known to Edwards until after her termination and, therefore, could not have contributed to her subjective view of a hostile environment.").

A primary part of Foster's affidavit to which AUM objects is her statement that Singleton told her he had been called "Do Boy" or "Boy" by Daryl Morris on "numerous" occasions and that Morris continued to refer to him in this manner.  Although Foster has stated that Singleton himself complained to her about Morris's conduct, Singleton did not refer to Morris's use of the phrase "Do Boy" or "Boy" in his deposition, or in his subsequently-submitted affidavit in which he does state that he was aware of actions by Katherine Jackson as stated in Foster's affidavit.

Singleton contends that because Foster was the Senior Director of Human Resources during the time the events in question occurred, she was a representative of AUM against whom the statements are offered, so that the statements are not hearsay under Rule 801(d)(2)(A).   Even assuming the rule would allow admissibility of out-of-court statements by Foster, the rule would not apply to statements made by others to Foster.   The court will, however, consider the evidence that Foster told Singleton to tell Morris that the use of "Do Boy" and "Boy" was inappropriate, and that she reported the matter to Wanda Blake as well.

AUM also moves to strike several exhibits as not having been disclosed pursuant to Rule 26(a).   These exhibits include the EEOC charges of Carrie Martin, Debra Foster, Adrianne Giles, and Louvenia McCray, and the Complaints of Foster, Giles, and McCray in cases against AUM.   Singleton offers these to demonstrate that his perception of his environment as hostile was objectively reasonable, because others also complained of harassment.

Singleton responds that AUM had the documents in its possession as the employer of these individuals, and that the materials were made available for copying and inspection per the Initial Disclosures.   The court will not exclude these exhibits as not having been disclosed, however, the challenged Complaints are not sworn statements.   The court will only consider the fact that they were filed, but will not consider the content of the Complaints.   As to the EEOC charges, for purposes of the harassment claim, the court will consider that they were filed, and will consider what has been shown to have been known to Singleton during his employment.

b.  Race-Based Conduct

Considering the admissible evidence presented by Singleton, he has presented some evidence of race-based, or arguably race-based, conduct. As noted above, Singleton has stated

8

that he was aware that a white employee in the Department of Housing and Residential Life called AUM employee Martin a racial epithet on an unspecified date.  He has also pointed to a race-based statement by Blake, made known to him, that an employee did not deserve his $95,000 salary because he was black, and a comment in 2004 by Allen upon his retirement that Singleton needed to watch his back because of his color.[5]

With regard to the use of "Do Boy" and "Boy" comments, AUM disputes that those words are race-based.  Words such as "boy" are not always race-based, but can be depending on "context, inflection, tone of voice, local custom, and historical usage."  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).   The court will consider the comments to be race-based for purposes of this case, drawing all reasonable inference in favor of the non-movant.

A different issue is presented with respect to other comments presented by Singleton.  Singleton has pointed to statements and conduct by Morris made in the context of Morris's supervision of Singleton.  This evidence does not involve race-neutral terms which could be race-based depending on context, but instead is evidence of comments or conduct by Morris which Singleton perceived to be race-based.  For example, Singleton confronted Morris after having heard that Morris said he would "take care of Beasley's ass," and when Morris said he "didn't mean it in that term," but wanted to correct some of Singleton's behavior, Singleton asked whether it was a racial thing, and Morris said "no."  (Singleton Dep. at p. 48:6-49:5).  Another example is Morris's assignment of duties, as to which Singleton took issue because

---

[5] In his brief, Singleton states that Janet Warren, an administrator at AUM, made it known, and her views were shared by others, that AUM hired too many African-Americans. (Doc. #31 at p. 34).   There is, however, no citation to any evidentiary support of any kind for this assertion in Singleton's brief, and the court will not consider it.

Morris was being controlling.  *(Id.* at p. 51:8-9).   With respect to these comments, there is no evidence before this court from which to conclude that Morris's statements or conduct were race-based.

The comments by former employee Shout to Allen regarding Singleton's evaluation, to the effect that they needed for Singleton not to be the best they had, similarly have not been shown to be race-based comments.  While Allen himself stated that Singleton should be careful because of his color, a comment which is race-based and which the court will consider, that does not make Shout's comments to Allen race-based.

Singleton has also pointed to evidence of which he was aware during his employment, such a requirement that only an African-American employee use a time clock, more favorable treatment of white employees by Morris, treatment of African-American women by Katherine Jackson, and Singleton's own exclusion from a meeting to demonstrate race-based treatment. The court will also consider this evidence.

### 2.  Merits of the Race Harassment Claim

Racial harassment in which no adverse "tangible employment action" is taken, but which is sufficient to constructively alter an employee's working conditions is actionable under Title VII.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).   To prove racial harassment a plaintiff must show that (1) he belongs to a protected group, (2) he has been subject to unwelcome harassment, (3) the harassment has been based on a protected characteristic, (4) the harassment is sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment, and (4) the employer is responsible for

10

the environment under a theory of vicarious or direct liability.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

AUM has challenged whether Singleton has established that conduct he experienced was sufficiently severe or pervasive to constitute racial harassment.  The severe or pervasive nature of harassment is established if a plaintiff shows that he subjectively perceived the working environment to be abusive, and that a reasonable person would view the environment as hostile and abusive.  *Miller*, 277 F.3d at 1276.

In this case, Singleton has placed emphasis on the use of the terms "Do Boy" or "Boy" in substantiating the severity or pervasiveness of harassment he says that he experienced.  As earlier stated, the court accepts for purposes of the Motion for Summary Judgment that the terms are racial terms in this case.  In his deposition, Singleton identified only a single use of the term "Do Boy" by Dale Caldwell, a former Human Resources employee, during a seminar "four to five years ago."  (Singleton Dep. at p. 31:23).   "Do Boy" meant that management pawned duties off on Singleton.  (*Id.* at p.38:1-5).  When asked whether there were other instances when someone referred to him as "Do Boy," Singleton answered "No. I think once is enough."  (*Id.* at p. 89:23-90:1).  Singleton states in his deposition that when Caldwell referred to him in this way at the seminar, Morris stated, "Man, don't say that."  (*Id.* at p. 36:5).

Foster, on the other hand, has stated in an affidavit that Daryl Morris used the terms "Do Boy" and "Boy," and that she told Singleton to tell Morris not to use that term.  Singleton himself, however, has not acknowledged in testimony the use of the term "Boy" or "Do Boy" by Morris, or even multiple uses of "Do Boy" by any AUM employee.

11

Foster's statement potentially creates a question of fact as to the use of these terms by Morris,[6] but the court finds it significant that Singleton did not acknowledge the comments pointed to by Foster either his own deposition, or in an affidavit filed in opposition to summary judgment wherein he specifically identifies the portions of other witnesses' affidavits of which he was aware.   The fact that Singleton does not point to any of his own testimony to substantiate the use of these terms by Morris appears to the court to tend to undermine his argument that he subjectively viewed the conduct as abusive.  *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

Turning to the objective severity of the harassment, the court considers: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  *See Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997).

In this case, all four factors point to the conduct not being sufficiently severe or pervasive to establish a racial harassment claim.  The single "Do Boy" comment by Caldwell; the statement by former-employee Allen upon his retirement in 2004 that Singleton should watch his back because of his color; the comment regarding an African-American's salary; the racial epithet directed at Martin, another employee, on one occasion; and the unspecified number of

---

[6] The court notes that while Foster has stated that Singleton complained to her that the terms "Do Boy" or "Boy" were used on "numerous" occasions, assuming that statement is admissible, that characterization itself is not determinative.  In an unpublished opinion, the Eleventh Circuit applied *Ash* and affirmed a district court's grant of summary judgment where a plaintiff testified that he was called "boy constantly," but could only recall eight specific instances over the course of two years where he was called that term.  *Alexander v. Opelika City Sch.*, 352 F. App'x 390, 393 (11th Cir. 2009).

uses of "Do Boy" or "Boy" by Morris, along with the few instances of other conduct identified by Singleton which are arguably race-based, because they are different treatment of white and African-American employees, occurred over a six-year period, and, therefore, do not constitute frequent conduct. *See, e.g., Cargo v. Alabama Bd. of Pardons and Parole Div.*, 391 F. App'x. 753, 755 (11th Cir. 2010) (stating "[f]ive or six incidents over the course of three to four years is hardly frequent conduct").   The racial epithet used by an employee to refer to Martin, the one severe comment in evidence, was not directed at Singleton. *See Alexander*, 352 F. App'x at 393 (noting that the most severe comment was not directed to the plaintiff in affirming summary judgment).   While Singleton has taken offense at some conduct, none of it was physically threatening or objectively humiliating, with the exception perhaps of the removal from a meeting attended by supervisors.  There has been no evidence to show that the incidents of harassment interfered with Singleton's job performance.  Viewing all of the admissible race-based, or arguably race-based, comments and conduct under the totality of the circumstances, including that EEOC charges and Complaints were filed by other employees, the court concludes that Singleton has not established that he was subject to racial harassment at AUM that was sufficiently severe or pervasive to alter the terms or conditions of employment and create a discriminatorily abusive working environment. *See Alexander*, 352 F. App'x at 393;  *Cyprian v. Auburn Univ.  Montgomery*, 799 F. Supp. 2d 1262, 1278 (M.D. Ala. 2011) (considering among other evidence the comment "Do Boy," the statement that an African-American should not make $95,000 a year, EEOC charges of other employees, and "a dislike for a time clock" and

concluding that they "do not meet the standard of objective severity or pervasiveness used by this circuit to evaluate hostile work environment claims.").[7]

### 3. Count II – Discrimination Claims

AUM moves for summary judgment as to the claims in Count II on the grounds that Singleton cannot bring a claim under §1981 against AUM, that his gender discrimination claim is barred because it was not raised before the EEOC, that he does not have a prima facie case of discrimination on the basis of race, and that he cannot establish pretext.

In response to the motion, Singleton only addresses his Title VII claim for discrimination on the basis of race. (Doc. #31 at p.21). Singleton having abandoned other discrimination claims, summary judgment is due to be GRANTED as to any §1981 race or Title VII gender claims. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995); *Road Sprinkler Fitters v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994). The court now turns to Singleton's Title VII race discrimination claim for termination.

### a. Direct Evidence

Singleton contends that he has presented a direct evidence case of discrimination. He points to race-based comments discussed above in connection with the harassment claim, such as "Do Boy" and "Boy," Blake's assessment of the salary paid to another African-American employee, and that former-employee Allen told him he needed to watch his back because of his

---

[7] The court has concluded above that Morris's statement that he would get Singleton's "ass"and other comments by Morris in the context of his supervision of Singleton, as well as Shout's pre-2004 comments to Singleton's then-supervisor Allen regarding an evaluation of Singleton, have not been shown to be race-based. Even considering that evidence, which extends the applicable timeline to a time even earlier than Allen's July 2004 comment to Singleton, the court would not conclude that Singleton has established severe or pervasive racial harassment under Eleventh Circuit law.

color.  Singleton also points to a comment by Morris that he would get Singleton's ass, and evidence that Blake required an African-American employee to use a time clock.  Singleton argues that these comments constitute direct evidence under precedent such as *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990).  Singleton does not identify a decision-maker for his termination, other than to state that Blake was a Vice-Chancellor involved with Morris to outsource the housing department, without citation to any evidence.

Direct evidence of discrimination "reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir.2004).  Direct evidence of discrimination is evidence, that, "if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Board of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir.1997).  Comments by non-decision makers or remarks unrelated to the decision making process are not direct evidence.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

The comments pointed to are unrelated to the decision-making process, particularly comments such as those by Allen upon his resignation in 2004, or comments about the salary of another employee, and are not direct evidence.  *See Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1291 (11th Cir. 1998) (comments remote in time or not directed at the plaintiff are not direct evidence).  Furthermore, none of the comments pointed to by Singleton have been shown through admissible evidence to have been made by decision makers involved in the decision to

outsource Singleton's job.  The court cannot conclude, therefore, that Singleton has established a direct evidence case of disparate treatment.[8]

### b.  Circumstantial Evidence

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  This framework first requires a plaintiff to make out a prima facie case of discrimination.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997).  Next, the defendant is given an opportunity to produce a legitimate, nondiscriminatory reason for the challenged employment action.  *Id.* at 1528.  Once the defendant has met his burden, the plaintiff is given an opportunity to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528.

In this case, Singleton contends that he was laid off from his job because of his race.  The exact scope of his claim, however, is somewhat unclear.  He has argued in his brief in opposition to summary judgment that he was replaced by white employees in his position, that he should have been retained in Morris's position, that he should have been transferred by AUM to another available position, that he disputes that he was interviewed by Sodexo, and that he was treated differently from similarly situated employees.  The court takes each of these in turn.

---

[8]  Having concluded that none of the evidence pointed to is direct evidence, the court finds that the Motion to Strike is due to be DENIED as moot as to the evidence submitted for purposes of the direct evidence claim.

16

i. Position Filled by Persons Outside of His Protected Group

To establish a prima facie case of discriminatory discharge, a plaintiff must show that (1) he is a member of the protected class, (2) he was qualified for the job from which he was discharged, (3) he was discharged, and (4) that he was treated less favorably than a similarly-situated person, or replaced by a person, outside his protected class.  *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Singleton contends that his role as Facilities Manager was assumed by a white male, Morris, and a white female, Blake.[9]  AUM states that Singleton cannot demonstrate that he was replaced by a person outside of his protected class.  AUM has presented evidence that Singleton's position as supervisor was classified as a trade service position and outsourced. (Decl. of Jeanine Boddie-Lavan at ¶5).   AUM has further provided the declaration of Meadows, Vice Chancellor of Financial Affairs, in which she states that on October 1, 2010, Sodexo assumed the job responsibilities of the former trade service employees, that neither she nor any other AUM employee, including Morris, assumed any duties of former trade service employees which were outsourced.  (Decl. of Wanda Meadows at ¶ 4).

Singleton disputes that his duties were not assumed by a Sodexo employee.  His support for this position comes in the form of citations to his own deposition in which he listed some duties which he states Morris took over after Singleton left, and his belief that Morris took over those duties. (Singleton Dep. at p. 115: 19-22; 172:5-17).   When asked whether he was assuming that Morris was performing those duties, Singleton answered, "Yes, I'm assuming."

─────────────

[9] As noted earlier, Wanda Black and Wanda Meadows appear to be the same Vice Chancellor of Financial Affairs.

(*Id.* at p. 116:11-13).   He similarly identified some duties he said were performed by Blake, and his belief that Blake took over some of those duties, but when asked whether he was assuming that Blake took over his duties, he answered, "Yes. Like I said, I feel–I assume that she did that." (*Id.* at p. 121:17-21).

Singleton's evidence, which consists of his opinion or belief, based on his admitted mere assumption, that his duties were assumed by other AUM employees is not sufficient, in light of AUM's affirmative evidence to the contrary, to demonstrate that there is a genuine dispute as to whether Singleton was replaced by a white employee. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (stating that an issue is not genuine if it is created by evidence that is "merely colorable" or is "not significantly probative.").   Singleton has failed to establish a prima facie case of discrimination in termination and summary judgment is due to be GRANTED as to this aspect of his claim.

ii.  Singleton Should Have Been Retained in Morris's Position

Singleton states that he trained Morris and was the most viable candidate for Morris's position, so Singleton should have been retained in the position which remained after outsourcing.  In his brief, Singleton states that he was "terminated and/or denied a promotion." (Doc. #31 at p. 25).

AUM states that there is no failure to promote claim in the Amended Complaint or EEOC charge,[10] and the court agrees.  (Doc. #3 & Ex. A).  Therefore, if Singleton is claiming that he

---

[10] AUM also argues that to the extent that Singleton now contends that he was not adequately compensated in his job before he was terminated, that claim is also not present in the Amended Complaint or EEOC charge.  The court agrees that there is no disparate compensation claim in this case.

should have received Morris's position at the time that Morris initially was made his supervisor, the court agrees that that is a failure to promote claim not fairly within the claims as pled in the Complaint. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.2004) (stating that a plaintiff cannot amend his complaint to add claims by simply arguing the claims in a brief in opposition to summary judgment); *see also Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006).   Therefore, summary judgment is due to be GRANTED to the extent that Singleton now seeks to assert such a claim.

If Singleton's claim is that he should have been promoted to Morris's position at the time that the decision was made to outsource positions, and that Morris should have been removed from the position, that is a theory which might be fairly within the claims asserted in this case, as it stems from his termination.  Singleton has not, however, cited any legal authority to demonstrate that AUM was required to place him in Morris's position at the time Singleton's position was outsourced.   *Cf. Jameson v. Arrow Co.*, 75 F.3d 1528, 1533 (11th Cir. 1996) (stating in the context of a reduction in force that the law does not require younger employees to be fired so that employees in a protected age group can be hired).   Furthermore, Singleton has not shown that Morris as Director and he as Supervisor were similarly-situated employees who were treated differently.  Summary judgment is, therefore, due to be GRANTED as to this theory as well.

### iii.  Singleton Should Have Been Transferred/Re-Hired

Singleton contends that under AUM policy, when he was placed in layoff status, he should have been transferred, based on his seniority, to another department.

In a reduction-in-force claim, a plaintiff can establish a prima facie case by showing (1) that he was in a protected group and was adversely affected by an employment decision; (2) that he was qualified to assume another position at the time of discharge or demotion; and (3) evidence by which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue. *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir.1987).  Where a job for which the plaintiff is qualified "is available at the time of . . . termination," and the employer offers the job to someone outside of the plaintiff's protected group, "an inference of intentional discrimination is permissible."  *Jameson v. Arrow Co.*, 75 F.3d 1528, 1531-33 (11th Cir. 1996).

Singleton provides a portion of the AUM Personnel Policies and Procedures Manual which states that layoffs will be initiated considering seniority, and that no new job applicant will be considered for regular employment in any job classification or reasonably comparable job classification "if there is someone in layoff status who qualifies for consideration."  (Doc. #32-2 at p.3).   Jeanine Boddie-Lavan ("Boddie-Lavan"), Senior Human Resources Officer, has stated in a Declaration that AUM's policy provides that an employee is given priority consideration for any available position for which the employee applies and is qualified. (Boddie-Lavan Decl. at ¶ 7).  Also according to Boddie-Lavan, Singleton submitted a resignation to AUM on October 6, 2010, which terminated his layoff status.  (*Id.*)

Because Boddie-Lavan states that an employee in layoff status must apply for an available position, but there is no mention of an application requirement for a person in layoff status in the policy provision cited to by Singleton, there may be a question as to what the duty of a laid-off employee is to be considered for an available position at AUM.  For that potential

20

question to be material in this case, however, there must be some evidence that there was an open position for which Singleton should have been considered during the period of his layoff status from September 30, 2010 to October 6, 2010. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1083 (11th Cir. 1990) (stating that a plaintiff must show that he was qualified for another available job with that employer).

Singleton states in his brief that open positions existed when he was laid off, but the portion of his deposition to which he cites in support of that argument is as follows:

> Q.  And you wanted to be considered for any available position at AUM upon your termination; is that correct?
> A.  That's correct.

(Singleton Dep. at p. 172:22-173:2).   In the fact section of his brief, he states that open positions existed, but the citation he provides is to his statement in his deposition that AUM should have asked him if he wanted to mop the floor, and he would have taken anything instead of losing his job.  *(Id.* at p. 140: 7-15).   This evidence does not establish that there were open positions for which Singleton should have been considered.  If there were no open positions for which Singleton was qualified, the law does not require AUM to transfer Singleton to a position. *See, e.g., Jameson*, 75 F.3d at 1533.  Singleton having failed to submit evidence that there was an open position for which he was qualified and should have been considered for at the time he was laid off or at any time before he resigned from his layoff status, summary judgment is due to be GRANTED as to this aspect of Singleton's claim.

iv.  Sodexo Interview

Although he does not dispute that AUM requested Sodexo to grant a job interview to all employees whose positions were outsourced to it, Singleton states in his brief that AUM cannot deflect its liability by stating that Sodexo interviewed the employees in the eliminated department because Singleton was not interviewed.   It is unclear to the court by what legal theory Singleton seeks to hold AUM liable for Sodexo's failure to hire him once his position became a Sodexo position.  Even if there were authority for such liability, the court cannot conclude that Singleton has created a question of fact as to whether Sodexo interviewed him.  He has cited his own deposition statement that he was not interviewed, but in his deposition he admits that he met with Sodexo representatives, and that he "can't say" his meeting was not an interview, and that "[m]aybe it was their interview, but I don't consider it a professional interview. That's why I said they didn't interview me."  Singleton Dep. at p. 103:8-12. Therefore, the court cannot conclude that there is a genuine dispute of fact on this point so as to preclude summary judgment. *Anderson*, 477 U.S. at 249-50.

### v.  Similarly-Situated Employees

Singleton contends that he can establish a prima facie case of discrimination by pointing to treatment of similarly-situated employees.   For the most part, however, he does not point to himself relative to any other employee, but has instead pointed to completely different employees.  He identifies Carrie Martin and Louvenia McCray as other African-American employees who were treated differently from a white employee, Adrianne Giles as an African-American employee who was required to use a time clock, and Debra Foster as an African-

American employee treated differently from several white employees.[11]  Singleton cannot

establish a prima facie case of discrimination in his own termination by pointing to treatment of

other African-American employees in other positions.  *See Holifield v. Reno*, 115 F.3d 1555,

1562 (11th Cir.1997) (stating that a plaintiff must show that he and the employees are similarly

situated in all relevant respects).   Singleton also invokes the term "pattern and practice,"

apparently intending this evidence to establish such a claim.  A private litigant cannot maintain a

pattern and practice claim unless it is brought as a class action, however.  *See Davis v.*

*Coca-Cola Bottling Co.*, 516 F.3d 955, 969 (11th Cir. 2008).

Singleton also mentions himself in this discussion within his brief, stating that he was not

permitted the benefits of other employees and was removed from a meeting of supervisors.  That

evidence, however, does not establish disparate treatment in termination.[12]  Summary judgment

is, therefore, due to be GRANTED as to this theory as well.

## V. CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

1. The Motion to Strike (Doc. #34) is DENIED in part, GRANTED in part, and DENIED

in part as moot, as discussed above.

---

[11]  While much of this evidence is the subject of the Motion to Strike on various grounds, including an objection that Foster's affidavit was not properly disclosed as expert testimony, as discussed below, Singleton has failed to make a valid legal comparison, so the Motion to Strike is due to be DENIED as moot as to the evidence of disparate treatment of similarly-situated persons.

[12]  No separate disparate treatment claims based on this evidence are identified in the EEOC charge or pled in the Amended Complaint.

2.  The Motion for Summary Judgment (Doc. #26) is GRANTED.  A Final Judgment will be entered in accordance with this Memorandum Opinion and Order.

Done this 13th day of September, 2012.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE

24